UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

NOT FOR PUBLICATION

---

ROYAL DISPATCH SERVICES, INC.,

                                                    Plaintiff,

             - versus -

UBS FINANCIAL SERVICES, INC.,

                                                    Defendant.

MEMORANDUM
AND ORDER

12-CV-2032

---

APPEARANCES:

PIKE & PIKE, P.C.
        1921 Bellmore Ave.
        Bellmore, New York  11710
By:     Laurence I. Cohen
        *Attorneys for Plaintiff*

RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP
        500 Fifth Ave., 49th Floor
        New York, New York  10110
By:     Julian W. Wells
        *Attorneys for Defendants*

JOHN GLEESON, United States District Judge:

Royal Dispatch Services, Inc. ("Royal") brings this action against UBS Financial Services, Inc. ("UBS"). Royal asserts that after providing ground transportation services to UBS for approximately nine years, UBS terminated the contract without providing the requisite 60 days' notice to Royal, thereby breaching the express terms of their contract and the duty of good-faith performance implied in all contracts under New York law. The parties have cross-moved for summary judgment. For the reasons set forth below, Royal's motion for summary judgment is denied and UBS's motion for summary judgment is granted.

BACKGROUND

A.      *Factual Background*

The following facts are taken from Local Rule 56.1 statements, affidavits, deposition excerpts, and other documentary evidence submitted by the parties. Unless otherwise noted, the facts set forth below are uncontroverted.

1.      *The Parties*

Royal provides ground transportation services in and around the tri-state area through a network of independent drivers. Turgut Ozen Decl. ¶ 3, ECF No. 42-1. Turgut Ozen is the President of Royal. Ozen Decl. ¶ 1. Joseph Aracri, Sr. serves as Royal's *de facto* Chief Financial Officer, and is responsible for overseeing Royal's finances. Joseph Aracri, Sr. Decl. ¶ 1, ECF No. 42-2.

Royal sells franchises to independent drivers ("franchisees") who meet certain qualifications, such as possessing the requisite licenses, insurance, and vehicles. Aracri Decl. ¶ 5. Under this arrangement, Royal refers jobs to franchisees in exchange for a percentage of each fare. Aracri Decl. ¶ 5. Franchisees may operate the franchise themselves or lease the franchise to qualified third-party drivers ("lessees"). Aracri Decl. ¶ 5. Franchisees who are in the process of financing a franchise pay a weekly franchise fee to Royal. Aracri Decl. ¶ 7. Drivers, whether franchisees or lessees, pay a weekly service fee to Royal.[1] Aracri Decl. ¶ 6.

UBS is a brokerage firm that provides financial services to investors. UBS 56.1 ¶ 2. UBS maintains offices in New York, New Jersey, and Connecticut. UBS 56.1 ¶ 2, ECF No.

---

[1] UBS purports to dispute these facts on the ground that "[w]hile [Royal] admitted at its deposition that it maintains written franchise agreements with its drivers, as well as 'driver files' showing the revenue that [Royal] allegedly derives from its drivers, [Royal] did not produce any of those documents to UBS in this litigation." UBS Resp. Royal 56.1 ¶¶ 7-10, 39-40. But that is a dispute over the production of certain documents during discovery, not a dispute over the facts relating to how Royal sells and operates franchises. Accordingly, I deem these facts admitted for purposes of these cross-motions.

44-2. UBS is a former client of Royal's. Ozen Decl. ¶ 4. Anna Marie Francello is the Executive Director, America's Head of Travel, Staff Services, and Environmental Management for UBS. Laurence Cohen Decl. Ex. 4 at 6:5-15 (Francello Dep.), ECF No. 42-7. Jeremy Groff is a Director in the Corporate Travel Department of UBS.[2] Cohen Decl. Ex. 5 at 9:23-10:7 (Groff Dep.), ECF No. 42-8.

      2.    *The General Services Agreement*

On or about August 5, 2002 Royal and UBS entered into a General Services Agreement ("GSA"). Cohen Decl. Ex. 3, ECF No. 42-6. Pursuant to the agreement, Royal agreed to provide ground transportation services to UBS. Cohen Decl. Ex. 3. Over the following nine years, Royal and UBS renewed and amended the GSA through a series of Amendments. Ozen Decl. ¶ 6; Cohen Decl. Ex. 3. The GSA provided that it would be "governed by and construed in accordance with the laws of the State of New York." Cohen Decl. Ex. 3 ¶ 10J.

Article 6, Subparagraph A of the GSA provides as follows:

**A. Early Termination**

> Notwithstanding Article 5, this Agreement may be terminated by UBS[ ] upon sixty (60) days notice to VENDOR for UBS['s] convenience or immediately upon a Default of the VENDOR as provided in Section B.

Cohen Decl. Ex. 3 ¶ 6A.

Article 7, Subparagraph A of the GSA provides as follows:

**A. Limitation of Liability**

> NEITHER PARTY SHALL BE LIABLE TO THE OTHER
> PARTY FOR SPECIAL, INCIDENTAL, CONSEQUENTIAL,

---

[2] UBS disputes these facts only to the extent that Francello and Groff are employees of UBS AG, which is an affiliate of UBS Financial Services, Inc. UBS Resp. Royal 56.1 ¶¶ 5-6, ECF No. 46-1.

INDIRECT, PUNITIVE OR EXEMPLARY DAMAGES
(INCLUDING BUT NOT LIMITED TO LOST DATA, LOST
PROFITS OR SAVINGS, LOSS OF BUSINESS OR OTHER
ECONOMIC LOSS) ARISING OUT OF OR RELATING TO
THIS AGREEMENT, WHETHER OR NOT SUCH PARTY
HAS BEEN ADVISED OR KNEW OF THE POSSIBILITY
OF SUCH DAMAGES, AND REGARDLESS OF THE
NATURE OF THE CAUSE OF ACTION OR THEORY
ASSERTED.

Cohen Decl. Ex. 3 ¶ 7A.

Article 10, Subparagraph E of the GSA provides as follows:

**E. Non-Exclusivity**

VENDOR understands that this Agreement is non-exclusive,
and that UBS[ ] reserves the right to obtain services and goods
of any type from other vendors.

Cohen Decl. Ex. 3 ¶ 10E.

3.  *The Parties' Business Relationship*

UBS employees utilized several methods for booking ground transportation

services from Royal and other vendors:

a.  Calling a dedicated telephone line maintained by UBS that
offers a recorded menu of ground transportation vendors, from
which an employee can select a vendor and be connected
directly to that vendor ("UBS ground transportation reservation
line"), Cohen Decl. Ex. 5 at 54:7-59:25 (Groff Dep.);

b.  Utilizing an on-line booking tool through a third-party website,
Aleph ("Aleph on-line booking tool"), Cohen Decl. Ex. 4 at
58:18-60:4 (Francello Dep.);[3]

c.  Obtaining vendor contact information from the UBS travel
website,[4] Cohen Decl. Ex. 5 at 17:11-20 (Groff Dep.), and then

---

[3]     Royal characterizes this on-line booking tool as one "running on a UBS intranet website," but the
evidence it cites to does not establish this fact.  *See* Royal Rule 56.1 ¶ 15(b), ECF No. 43 (citing Cohen Decl. Ex. 5
at 30:6-8 (Groff Dep.)).  UBS controverts this fact by citing to testimony rejecting the characterization of the Aleph
on-line booking tool as "a UBS website."  *See* UBS Resp. Royal Rule 56.1 ¶ 15 (citing Cohen Decl. Ex. 4, at 58:18-
59:6 (Francello Dep.)).  In fact, the UBS travel website, which UBS maintained on its intranet, Cohen Decl. Ex. 5 at
17:11-20 (Groff Dep.), appears to direct UBS employees to the Aleph on-line booking tool, Cohen Dec. Ex. 4 at
58:14-59:17 (Francello Dep.).

(1) Calling the vendor's office directly ("vendor direct dial"), Cohen Decl. Ex. 4 at 58:14-18 (Francello Dep.), Cohen Decl. Ex. 5 at 52:21-53:15 (Groff Dep.); or

(2) Utilizing an on-line booking tool on the vendor's website ("vendor on-line booking tool"), Cohen Decl. Ex. 5 at 52:21-53:5 (Groff Dep.).

UBS listed Royal as a vendor on its ground transportation reservation line beginning in at least January 2009. Ozen Decl. ¶ 9; Cohen Decl. Ex. 4 at 80:10-14 (Francello Dep.); Cohen Decl. Ex. 5 at 61:9-15 (Groff Dep.). Royal was one of three New York-based vendors listed on the UBS ground transportation reservation line. Cohen Decl. Ex. 5 at 46:15-22 (Groff Dep.). However, in or around 2011, UBS had contracts with approximately nine ground transportation vendors (including Royal) that serviced the tri-state area, all of which were listed on the UBS ground transportation line, and provided rides to UBS employees within this area.[5] Cohen Decl. Ex. 4 at 30:17-31:11, 32:9-13, 70:13-18 (Francello Dep.); Cohen Decl. Ex. 5 at 45:5-46:2 (Groff Dep.).

Royal appeared as a vendor on the Aleph on-line booking tool beginning sometime in 2011. Cohen Decl. Ex. 5 at 30:13-25, 31:14-21-23, 32:13-21 (Groff Dep.).

### 4. *The November 8, 2011 Termination Notice*

On November 8, 2011 UBS informed Royal by letter of its decision to exercise its right to terminate the GSA following the 60-day notice period. Cohen Decl. Ex. 9, ECF No. 42-12. The letter stated, in pertinent part:

---

[4]      The travel website permitted UBS employees to submit their information, which would be forwarded to contracted vendors, who would set up individual profiles for those UBS employees. Cohen Decl. Ex. 5 at 113:18-22 (Groff Dep.). A contracted vendor is a vendor with whom UBS has a contract. Cohen Decl. Ex. 5 at 19:4-5 (Groff Dep.).

[5]      UBS represents that in or around 2011, it contracted with approximately twelve vendors but that three of those vendors did not provide services to UBS employees in the tri-state area. Cohen Decl. Ex. 4 at 30:17-31:11, 32:9-13 (Francello Dep.).

> We believe that despite considerable efforts on our part, it is not
> possible to come to a satisfactory resolution of the outstanding
> issues between us. We have therefore decided to exercise our right
> under Article 6.A to terminate the agreement effective 60 days
> from your receipt of this letter as determined under Article 10.A.

Cohen Decl. Ex. 9.

On November 9, 2011 Timothy Keenan[6] sent an email to Groff confirming that he had "[r]emoved Executive from the order form" on the Aleph on-line booking tool.[7] Cohen Decl. Ex. 11, ECF No. 42-14; Cohen Decl. Ex. 5 at 116:9-117:12 (Groff Dep.).

Sometime between November 9 and November 14, 2011 Groff instructed UBS employee Whitney Franklin to remove Royal's contact information from the UBS travel website. Cohen Decl. Ex. 4 at 137:14-139:1 (Francello Dep.); Cohen Decl. Ex. 5 at 95:6-15 (Groff Dep.). On November 10, 2011 Franklin directed UBS employee Angelo Merluccio via e-mail to "remove Last/Radio/Executive Cars and all phone #s associated with it from the intranet effective immediately." Cohen Decl. Ex. 12, ECF No. 42-15; Cohen Decl. Ex. 5 at 112:11-113:5 (Groff Dep.). On the same day Keenan instructed UBS employee Allison Clarke by e-mail that "Executive Last Radio effective November 9th is no longer a preferred vendor of UBS." Cohen Decl. Ex. 13, ECF No. 42-16; Cohen Decl. 5 at 118:5-18 (Groff Dep.).

On November 14, 2011 Francello sent an e-mail to several UBS employees.[8] Cohen Decl. Ex. 14, ECF No. 42-17. Francello's e-mail referenced an e-mail received earlier

---

[6] Royal asserts that Keenan was a UBS employee at the time he sent this email, but UBS controverts this fact with evidence that Keenan was an employee of BCD Travel, a travel vendor for UBS, and worked out of the UBS office in Stamford, Connecticut. Cohen Decl. Ex. 4 at 17:6-21 (Francello Dep.).

[7] Royal asserts that Executive Cars ("Executive") and Last Radio are subsidiaries of Royal, but the evidence that it cites to in support of this assertion makes no mention of either Executive or Last Radio. Royal Rule 56.1 ¶ 1 (citing Ozen Decl. ¶ 3; Aracri Decl. ¶ 3). Nevertheless, I deem this fact admitted for purposes of these cross-motions as UBS does not dispute this assertion.

[8] The e-mail was addressed to James Petrie, Priska Schmidli, and Rabindranath Singh, with Groff copied. Cohen Decl. Ex. 14. Petrie was counsel in the UBS Legal and Compliance department. Cohen Decl. Ex. 4 at 23:20-24:11 (Francello Dep.). Schmidli and Singh were members of the UBS sourcing team. Cohen Decl. Ex. 4 at 133:18-20, 157:7-10 (Francello Dep.).

that day from Ozen, which indicates Royal's receipt of UBS's November 8, 2011 termination

letter, notes that "Royal and UBS have had a very long standing relationship," and "welcome[s]

the opportunity to meet and discuss" disagreements over the GSA. Cohen Decl. Ex. 14.

Francello's email states: "We are done. Already removed them from all traveler-facing systems

and communicated to all divisional business managers, as well as top users last week." Cohen

Decl. Ex. 14. Francello later clarified during her deposition that the email indicated that Royal's

information had been removed from the travel website as well as from the Aleph on-line booking

tool. Cohen Decl. Ex. 4 at 134:15-136:3 (Francello Dep.).

On November 15, 2011 UBS employee Thomas Bulla removed Royal from the

list of vendors on the UBS ground transportation line.[9] Cohen Decl. Ex. 15, ECF No. 42-18;

Cohen Decl. Ex. 5 at 94:4-20 (Groff Dep.).

Royal provided 768 rides to UBS employees totaling $65,533.38 during the 60-

day notice period.[10] Aracri Decl. ¶ 11; Cohen Decl. Ex. 5 at 87:24-88:5 (Groff Dep.); Anna

Marie Francello Ex. C, ECF No. 44-6.

---

[9]    Royal asserts that Bulla removed Royal from the list of vendors on November 14, 2011, but the e-mail chain cited to by Royal indicates that this removal process was completed on November 15, 2011. Cohen Decl. Ex. 15.

[10]    UBS disputes this fact only to the extent that it asserts that the 60-day notice period commenced on November 9, 2011, not November 8, 2011. UBS Resp. Royal 56.1 ¶ 35. It does not, however, dispute the amount of services provided by Royal to UBS during this period. UBS 56.1 ¶ 20.

Royal further asserts that its estimated gross sales on the UBS account for the 60-day notice period were $387,000. Royal 56.1 ¶ 34 (citing Aracri Decl. ¶ 10). Royal then asserts that "[t]he difference between Royal's estimated gross sales and actual business performed during the 60 day period commencing November 8, 2011 was $332,466.62." Royal 56.1 ¶ 36 (citing Aracri Decl. ¶ 11). Finally, Royal asserts that its average profit margin in 2011 was 27% and that 27% of $321,466.32 is $86,795.99. Royal 56.1 ¶¶ 37-38.

UBS disputes these facts on several grounds. With respect to Royal's estimation of gross sales during the 60-day notice period, UBS asserts some ambiguity as to whether this estimation was drawn from historical revenue data for an entire calendar year or for a 60-day period from November to January. UBS Resp. Royal 56.1 ¶¶ 34, 36 (citing Julian Wells Aff. Ex. A at 73:3-74:21 (Ozen Dep.), ECF No. 46-2, Ex. B at 36:2-37:22 (Aracri Dep.), ECF No. 46-2). With respect to Royal's estimation of its average profit margin, UBS asserts some ambiguity as whether the margin was based on franchise agreements or a year-end financial report. UBS Resp. Royal 56.1 ¶ 37 (citing Wells Aff. Ex. A 77:21-79:6 (Ozen Dep.), Ex. B at 41:3-14 (Aracri Dep.)).

Following UBS's alleged termination of the GSA (during the 60-day notice period), approximately 40 drivers left Royal and ceased paying their weekly franchise and service fees.[11]  Aracri Decl. ¶ 15.

B.    *Procedural History*

Royal commenced this action against UBS in state court on or about March 28, 2012, *see* Summons, ECF No. 1, at 4, asserting causes of action for anticipatory breach of contract and breach of the covenant of good faith and fair dealing, *see* Compl., ECF No. 1, at 5-9.  UBS removed the action pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, on or about April 25, 2012.  *See* Notice of Removal, ECF No. 1.  On May 24, 2012 Royal filed an amended complaint, which added a third count for breach of contract.  *See* Am. Compl., ECF No. 11.

On June 22, 2012 UBS filed a motion to dismiss the complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").  I heard oral argument on July 27, 2012.  On July 31, 2012 I issued a Memorandum and Order granting UBS's motion as to the claim for anticipatory breach of contract but denying the motion as to the claims for breach of contract and breach of the implied duty of good faith.  *See Royal Dispatch Services, Inc. v. UBS Financial Services, Inc.*, No. 12-cv-2032, 2012 WL 3113291 (E.D.N.Y. July 31, 2012).

UBS filed its answer to the amended complaint on August 10, 2012.  *See* Answer, ECF No. 17.  The parties completed discovery on April 30, 2013.  *See* Order, ECF No. 37. Royal filed its motion for summary judgment on July 1, 2013.  UBS filed its motion for summary judgment on July 2, 2013.  I heard oral argument on July 26, 2013.

---

[11]    UBS disputes this fact, primarily on the ground that Royal "should have been able to determine the exact numbers of drivers who allegedly stopped paying fees to [Royal] during that period" and noting some ambiguity as to exactly which drivers still owed Royal franchise fees.  UBS Resp. Royal 56.1 ¶ 41 (citing Wells Aff. Ex. B at 54:7-18, 57:1-4 (Aracri Dep.)).

## DISCUSSION

A. *Summary Judgment Standard*

A court may grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

B. *Rules of Interpretation*

The GSA contains a New York choice-of-law provision, *see* Cohen Decl. Ex. 3 ¶ 10J, and the parties do not dispute that New York law applies to Royal's claims, *see* UBS 56.1 ¶ 4; Royal Resp. UBS 56.1 ¶ 4, ECF No. 45-1. "Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000) (citing *Breed v. Insurance Company of North America*, 46 N.Y.2d 351 (N.Y. 1978)). Thus, the Court's analysis properly begins with the text within the four corners of the contract. *See RJE Corp. v. Northville Industries Corp.*, 329 F.3d 310, 314 (2d Cir. 2003) ("'Where a contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence.'") (quoting *De Luca v. De Luca*, 751 N.Y.S.2d 766, 766 (N.Y. 2000)).

"In interpreting a contract under New York law, 'words and phrases . . . should be given their plain meaning,' and the contract 'should be construed so as to give full meaning and effect to all of its provisions.'"  *LaSalle Bank National Association v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (quoting *Shaw Group, Inc. v. Triplefine International Corp.*, 322 F.3d 115, 121 (2d Cir. 2003)).  "[A]n interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'"  *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) (quoting *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988)).  In other words, "an interpretation that 'gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect.'"  *Id.* (quoting *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1988) and citing New York cases).

Summary judgment is appropriate only if the contractual language is "plain and unambiguous."  *Zurich American Insurance Co. v. ABM Industries, Inc.*, 397 F.3d 158, 164 (2d Cir. 2005) (quoting *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 148 (2d Cir. 1993)); *Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) ("When the question is a contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity.") (citations omitted). Contractual language is plain and unambiguous if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion."  *Sayers v. Rochester Telephone Corp. Supplemental Management Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (internal quotation marks and citations omitted).  "The proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by

summary judgment." *Omni Quartz v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002). But "when the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment." *LaSalle* 424 F.3d at 205.

C.      *Analysis*

1.      *Breach of Contract*

"The elements of a breach of contract claim under New York law are: (1) the existence of a contract; (2) due performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages resulting from the breach." *Columbia Artists Management, LLC v. Alvarez*, No. 08-cv-11254, 2010 WL 53936097, at *3 (S.D.N.Y. Dec. 23, 2010) (quoting *Marks v. New York University*, 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999)). The parties do not dispute the existence of a contract between Royal and UBS, nor do they dispute that Royal performed its obligations under the contract. The central dispute is whether UBS breached the contract by terminating the GSA prior to the conclusion of the 60-day notice period.

Article 6, Subparagraph A, of the GSA provides, in relevant part, that the GSA "may be terminated by UBS[ ] upon sixty (60) days notice to VENDOR for UBS[ ] convenience." Cohen Decl. Ex. 3 ¶ 6A. The parties do not dispute that on November 8, 2011 UBS informed Royal of its decision to exercise its right to terminate the GSA following the 60-day notice period. Royal 56.1 ¶ 23; UBS 56.1 ¶ 16. Royal, however, asserts that UBS breached Article 6, Subparagraph A, of the GSA by effectively terminating the GSA in the days following its November 8, 2011 termination notice. Royal Mem. in Supp. Mot. Summ. J. 5-7, ECF No. 42-19. Specifically, Royal argues that by November 15, 2011, UBS had removed Royal from its ground transportation reservation line, Aleph on-line booking tool, and internal travel website,

thereby "cutting off all means used by its employees to access Royal's services" and "prevent[ing] Royal from receiving transportation requests." *Id*. at 5, 7.

UBS counters by arguing that the GSA did not require UBS "to keep [Royal] on any list of approved vendors, or to include [Royal] on UBS's automated vendor phone line, its intranet vendor page or its online vendor booking tool." UBS Mem. in Opp. Royal Mot. Summ. J. 14, ECF No. 46. UBS also asserts that under Article 10, Subparagraph E, of the GSA, which was a "non-exclusivity" provision, it "was expressly permitted to use other ground transportation providers at any time," and not "obligate[d] . . . to give [Royal] any minimum amount of business during any period." *Id*. at 14-15 (emphasis in original). UBS casts Royal's position as one that "ask[s] the Court to rewrite the Agreement to include terms that were never agreed to by the parties." *Id*. at 15.

UBS's argument is a straw man. Royal does not suggest that the terms of the GSA obligated UBS to maintain Royal's information on its ground transportation reservation line, Aleph on-line booking tool, or internal travel website or to provide Royal with a minimum amount of business. Rather, Royal contends that UBS effectively terminated the GSA without regard for the 60-day notice period by erasing Royal's information from these booking tools. *See* Royal Mem. in Supp. Mot. Summ. J. 2 ("UBS did not wait for the sixty day period to run as it was contractually obligated to do. . . . [T]he day following issuance of the termination letter, UBS embarked upon steps to rapidly dismantle . . . every conduit through which UBS employees previously booked Royal's transportation services . . . ."). Furthermore, Royal points to the decreased amount of business conducted between UBS and Royal during the 60-day notice period as evidence of this *de facto* termination of the GSA. *Id*. ("The result of this conduct was an immediate and catastrophic drop in Royal's call volume.").

UBS, in other words, fails to squarely address the text or meaning of Article 6, Subparagraph A, of the GSA, which is the provision that Royal alleges it breached. This failure is not surprising considering that UBS's position boils down to the assertion that it was entirely free to cut off all business to Royal during the 60-day notice period (or, in fact, during any point over the course of their business relationship). *See* UBS Mem. in Opp. Royal Mot. Summ. J. 15 ("For nearly ten years, from August 2002 to November 2011, it is undisputed that UBS did not have to give Plaintiff any business whatsoever under the Agreement."). But UBS's position necessarily renders the 60-day notice period provision a dead letter. And, as discussed above, "an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible." *Galli*, 973 F.2d at 149 (internal quotation marks and citations omitted).

I agree therefore with Royal's position that a wholesale dismantling by UBS of the means by which its employees hired Royal for ground transportation services during the 60-day notice period would constitute a breach of the contract. The record contains much evidence of such dismantling. It is undisputed that by November 15, 2011 – less than a week following the November 8, 2011 termination notice – UBS had removed Royal from its ground transportation reservation line, *see* Cohen Decl. Ex. 15; Cohen Decl. Ex. 5 at 94:4-20 (Groff Dep.), Aleph on-line booking tool, *see* Cohen Decl. Ex. 11; Cohen Decl. Ex. 5 at 116:9-117:12 (Groff Dep.), and internal travel website, *see* Cohen Decl. Ex. 4 at 137:14-139:1 (Francello Dep.); Cohen Decl. Ex. 5 at 95:6-16 (Groff Dep.). It is further undisputed that these tools were the methods by which UBS employees booked ground transportation services from Royal. Royal 56.1 ¶ 15; UBS Resp. Royal 56.1 ¶ 15.

There is, however, one factual wrinkle in the record. During the 60-day notice period, UBS employees received 768 rides from Royal, totaling $65,553.38. Aracri Decl. ¶ 11; Cohen Decl. Ex. 4 at 87:24-88:5 (Groff Dep.); Anna Marie Francello Ex. C. The parties dispute the significance of this fact. Royal contends that "[t]his business consisted predominantly of previously-placed reservations . . . and direct calls to Royal's offices." Royal Reply Mot. Summ. J. 4 & n.3, ECF No. 48 (citing Ozen Decl. ¶ 24). UBS, for its part, suggests that these rides were booked by UBS employees during the 60-day notice period by directly contacting Royal. UBS Mem. in Opp. Royal Mot. Summ. J. 16 ("Contrary to [Royal]'s contentions, UBS did not 'prevent its employees from further utilizing [Royal's] services' after terminating the Agreement on November 8, 2011. Rather, while [Royal] was removed from UBS's vendor booking tools, UBS travelers could still – and, in fact, did – contact [Royal] directly."). Royal further asserts that the $65,553.38 it earned from UBS during this period represented a "drastic drop" in business "characteristic of the aftermath of an immediate termination." Royal Reply Mot. Summ. J. 4. UBS, on the other hand, disputes the methods by which Royal has estimated its drop in business, *see* Royal Resp. UBS 56.1 ¶¶ 34, 36-38, and characterizes the shortfall as "a 'lessening' of [the] relationship," rather than an immediate termination, UBS Mem. in Opp. Royal Mot. Summ. J. 17.

The evidence of these rides is potentially in tension with Royal's assertion that UBS entirely dismantled the means by which UBS employees hired Royal for ground transportation services during the 60-day notice period.[12] As a threshold matter, the parties dispute how to characterize the shortfall between what Royal would have normally booked and earned during this period and what it actually booked and earned. Without a clearer picture of

---

[12] At one point, Royal softens this assertion by stating that UBS "took immediate steps to disable all means *within its control* to prevent its employees from contacting Royal." Royal Mem. in Supp. Mot. Summ. J. 8 (emphasis added).

how much Royal would have normally booked and earned during this period, I cannot assess whether the 768 rides totaling $65,553.38 was a *de minimis* amount of business (as Royal asserts) or merely a natural "lessening" of the Royal-UBS relationship during the 60-day notice period (as UBS asserts). Moreover, while Royal argues that these rides were a combination of those booked by UBS employees in advance of the 60-day notice period and those booked during the notice period, UBS asserts that these rides fall into the latter category. Neither party presents evidence suggesting what percentage of these rides fall into the two categories. But if UBS's argument is correct, it undermines Royal's position that UBS entirely dismantled the means by which UBS employees booked rides from Royal. Accordingly, both Royal and UBS's motions for summary judgment as to the breach of contract claim are denied.

2. *Breach of the Implied Covenant of Good Faith and Fair Dealing*

Every contract governed by New York law contains an implied covenant of good faith and fair dealing. *National Market Share, Inc. v. Sterling National Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (citing *United States Fidelity and Guaranty Co. v. Braspetro Oil Services Co.*, 369 F.3d 34, 64 (2d Cir. 2004)). This duty "embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Dalton v. Educational Testing Services*, 87 N.Y.2d 384, 389 (N.Y. 1995) (citing *Kirke La Shelle Co. v. Armstrong Co.*, 263 N.Y. 79, 87 (N.Y. 1933)). "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Id.* (citing *Tedeschi v. Wagner College*, 49 N.Y.2d 652, 659 (N.Y. 1980)).

A claim for breach of an implied covenant of good faith and fair dealing does not ordinarily provide a cause of action separate from a breach of contract claim. "Under New York

law, parties to an express contract are bound by an implied duty of good faith, but breach of that

duty is merely a breach of the underlying contract." *Harris v. Provident Life and Accident

Insurance Co.*, 310 F.3d 73, 80 (2d Cir. 2002) (quoting *Fasolino Foods Co. v. Banca Nazionale

del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992)). For that reason, New York law recognizes a

breach of the implied covenant claim only where such a claim is premised on a different set of

facts from those underlying a breach of contract claim. *Id.* at 81 ("New York law . . . does not

recognize a separate cause of action for breach of the implied covenant of good faith and fair

dealing when a breach of contract claim, based on upon the same facts, is also pled."); *Dorset

Industries, Inc. v. Unified Grocers, Inc.*, 893 F. Supp. 2d 395, 405 (E.D.N.Y. 2012) ("[A] claim

for breach of the covenant of good faith and fair dealing will be duplicative of a breach of

contract claim where the claims are based on the same allegations or where the same conduct is

the predicate for both claims.") (citation omitted); *ICD Holdings S.A. v. Frankel*, 976 F.Supp.

234, 243-44 (S.D.N.Y. 1997) ("A claim for breach of the implied covenant will be dismissed as

redundant where the conduct allegedly violating the implied covenant is also the predicate for

breach of contract of an express provision of the underlying contract.").

      Here, Royal's breach of the implied covenant of good faith claim is premised on

the same factual allegations as its breach of contract claim. Royal's breach of the implied

covenant claim rests on UBS's alleged failure to abide by the 60-day notice period prior to

terminating the GSA. Royal points specifically to UBS's conduct in dismantling the "booking

tools UBS employees previously used to contact Royal (i.e., the 'press 2 for Royal' prompt on

the ground transportation telephone line; the on-line reservations system; and the contact

information for Royal on the travel website)." Royal Mem. in Supp. Mot. Summ. J. 10.

Accordingly, I conclude that Royal's breach of the implied covenant of good faith claim is

duplicative of its breach of contract claim and grant UBS's motion for summary judgment on this claim.

3.  *Limitation of Liability*

Under New York law, "[a] limitation on liability provision in a contract represents the parties' [a]greement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor." *Metropolitan Life Insurance Co. v. Noble Lowndes International, Inc.*, 84 N.Y.2d 430, 436 (N.Y. 1994). "Public policy, however, forbids a party's attempt to escape liability, through a contractual clause, for damages occasioned by 'grossly negligent conduct.'" *Colnaghi, U.S.A., Ltd. v. Jewelers Protection Services, Ltd.*, 81 N.Y.2d 821, 823 (N.Y. 1993) (quoting *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 554 (N.Y. 1992)); *Kalisch-Jarchoc, Inc. v. City of New York*, 58 N.Y.2d 377, 416 (N.Y. 1983) ("[A]n exculpatory agreement, no matter how flat and unqualified its terms, will not exonerate a party from liability under all circumstances. Under announced public policy, it will not apply to exemption of willful or grossly negligent acts."). In this context, "'gross negligence' differs in kind, not only degree, from claims of ordinary negligence;" "[i]t is conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." *Colnaghi*, 81 N.Y.2d at 823-24; *Kalisch-Jarcho*, 58 N.Y.2d at 416 ("More pointedly, an exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing."). Such conduct "can be explicit, as when it is fraudulent, malicious or prompted by the sinister intention of one acting in bad faith[, o]r, when, as in gross negligence, it betokens

a reckless indifference to the rights of others, it may be implicit."[13] *Kalisch-Jarcho*, 58 N.Y.2d at 416-17.

Article 7, Subparagraph A, of the GSA provides that

> NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR SPECIAL, INCIDENTAL, CONSEQUENTIAL, INDIRECT, PUNITIVE OR EXEMPLARY DAMAGES (INCLUDING BUT NOT LIMITED TO LOST DATA, LOST PROFITS OR SAVINGS, LOSS OF BUSINESS OR OTHER ECONOMIC LOSS) ARISING OUT OF OR RELATING TO THIS AGREEMNT, WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OR KNEW OF THE POSSIBILITY OF SUCH DAMAGES, AND REGARDLESS OF THE NATURE OF THE CAUSE OF ACTION OR THEORY ASSERTED.

Cohen Decl. Ex. 3 ¶ 7A. UBS asserts that Royal's alleged damages are expressly barred by this provision of the GSA. Specifically, UBS argues that the lost revenue Royal claims it would have received from UBS absent the alleged breach of the GSA constitutes special, consequential and/or exemplary damages barred by this provision. UBS Mem. in Supp. Mot. Summ. J. 19-20, ECF No. 44-1. UBS argues that the lost "weekly fees" and "franchise fees" Royal claims third-party drivers ceased paying following UBS's alleged breach of the GSA constitute consequential damages also barred by this provision.

Royal does not dispute in its moving papers that the lost revenue from UBS and lost "weekly fees," and "franchise fees" from third-party drivers constitute damages contemplated by Article 7, Subparagraph A, of the GSA.[14] *See* Royal Mem. in Supp. Mot.

---

[13] The New York Court of Appeals's explication of the "gross negligence" standard in this context appears to permit the interchangeable use of the concepts of "gross negligence" and "recklessness," which are distinguishable in other contexts. However, at oral argument, the parties agreed that a limitation of liability provision is rendered enforceable by circumstances beyond an intentional breach, specifically circumstances that establish malice or bad faith.

[14] At oral argument, Royal raised the belated claim that the lost revenue from UBS constituted contractual damages, as opposed to consequential damages. In other words, it argued that such damages fall outside the scope of the limitation of liability provision despite appearing on the face of that provision. In response, I asked

Summ. J. 11-12.  It counters, however, that UBS is estopped from relying on the GSA's limitation of liability provision because UBS acted in bad faith.  The actions Royal alleges UBS undertook in bad faith consist of dismantling the means by which UBS employees could request ground transportation services from Royal, informing "high-volume users within UBS that they should refrain from using Royal's services, and by misleading UBS employees by not disclosing that they should continue to use Royal during the sixty day period."  Royal Mem. in Supp. Mot. Summ. J. 12.

The evidence that Royal cites does not render the limitation of liability provision of the GSA unenforceable.  UBS did remove Royal's information from the booking tools UBS employees utilized to request Royal's services within days of sending the November 8, 2011 termination notice.  At the same time, as discussed above, the record indicates that UBS permitted its employees to continue to book rides with Royal during the sixty-day notice period.

Royal's assertion that UBS informed "high-volume users . . . that they should refrain from using Royal's services" is not supported by the record.  Royal's main evidence to this effect is a November 14, 2011 email from Francello to several UBS employees stating, "We are done.  Already removed them from all traveler-facing systems and communicated to all divisional business managers, as well as top users last week."  Cohen Decl. Ex. 14.  The language of the email is ambiguous, but a plain reading lends the interpretation that Francello was requesting communication to all divisional business managers that Royal had been removed from "all traveler-facing systems."  The language is certainly not synonymous with the message

---

UBS whether its position would render the 60-day notice period superfluous given that the limitation of liability provision appears to cover all damages flowing from the alleged breach of that notice period.  UBS responded that in addition to exempting malicious breaches, the limitation of liability provision would not cover out-of-pocket expenses, which would constitute contractual damages under the GSA.  Royal had no answer to this argument and I conclude that reading the limitation of liability provision as barring all damages claimed by Royal would not render the 60-day notice period superfluous.

that UBS employees should "*refrain* from using Royal's services," a reading that is further

belied by the fact that some UBS employees did continue to book services through Royal.

      Finally, Royal contends that UBS acted in bad faith "by misleading UBS

employees by not disclosing that they should continue to use Royal during the sixty day period."

Royal Mem. in Supp. Mot. Summ. J. 12.  Royal appears to cite two isolated examples in support

of this contention.  First, on December 15, 2011, Groff failed to respond to an e-mail from a UBS

employee requesting if he could continue to use Royal's services.  Cohen Decl. Ex. 10, ECF No.

42-13s; Cohen Decl. Ex. 5 at 110:19-111:10 (Groff Dep.).  Second, on November 10, 2011, a

UBS employee who had lodged a complaint against Royal was instructed that Royal was "no

longer a preferred vendor of UBS" and to use alternate vendors "going forward."  Cohen Dec.

Ex. 13, ECF No. 42-16.[15]  These isolated instances are hardly indicative of conduct that "smacks

of intentional wrongdoing."  Moreover, in citing to the first email, Royal omits that Groff had

previously informed the UBS employee (on November 11, 2011) that UBS had opted to

terminate the GSA with Royal and that "[t]he termination will be effective 60 days from the

notification date of November 9, 2011."  Cohen Decl. Ex. 10.  In short, Royal has failed to

adduce evidence indicating that UBS's conduct was so grossly negligent (or exhibited such bad

faith) that it rendered the limitation on liability provision unenforceable.  Accordingly, I grant

UBS's motion for summary judgment on the ground that Royal's alleged damages are expressly

barred by the GSA.

---

[15]    Royal erroneously cites to this email as Cohen Decl. Ex. 12.

## CONCLUSION

For the reasons stated above, Royal's motion for summary judgment is denied and UBS's motion for summary judgment is granted in part. The Clerk is directed to close this case.

So ordered.

John Gleeson, U.S.D.J.

Dated: July 31, 2013
      Brooklyn, New York